**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

**CHARLESTON DIVISION**

David Seabrook,                                    )
                                                   )        C/A No.: 2:20-cv-03093-RMG-MGB
            Plaintiff,                             )
                                                   )
v.                                                 )
                                                   )
                                                   )        <u>**Expert Report of Brian S. Batterton**</u>
City of North Charleston, Charleston County        )
EMS, Sgt. Robert Kruger, Officer Scott             )
Thomes, K-9 Officer D. Green, Officer William      )
Taylor, John Doe, April Gadsden,                   )
                                                   )
            Defendants.                            )
                                                   )

1. My name is Brian S. Batterton. I have been actively involved in police practices and law enforcement since 1994. I am currently an active police officer at the rank of police major.

2. My education includes a Bachelor of Science Degree in Criminal Justice from Georgia State University in Atlanta, Georgia and a Juris Doctor from John Marshall Law School in Atlanta, Georgia. I am an active member of the State Bar of Georgia.

3. I am currently on the Legal and Professional Advisory Board of the Legal and Liability Risk Management Institute. This organization provides training and other consulting services to law enforcement agencies throughout the United States. As part of the Legal and Liability Risk Management Institute, I conduct policy and legal training for law enforcement agencies and school officials throughout the United States. I also author articles related to various law

1

**EXHIBIT 1**

enforcement topics that are sent to law enforcement officers and school officials throughout the United States.

4. Since 2006, I have conducted numerous training sessions for public employees. Participants in this training have included law enforcement officials, school officials, and attorneys. I have provided training in the following areas:

    a. Policy development for public safety agencies.

    b. Legal Issues in police use of force and use of force training.

    c. Police misconduct/civil liability.

    d. Arrest, Search and Seizure, & Interrogation.

    e. Racial profiling.

    f. Legal issues in public schools.

    g. Constitutional update for law enforcement officers.

    h. Legal/policy and decision-making factors in law enforcement pursuits including use of force/intervention tactics.

5. I am currently police Major for the Cobb County (GA) Police Department in Marietta, Georgia. I have been employed by the Cobb County Police Department since 1995. During my tenure there, I have served in the following capacities: a patrol officer in the Uniform Patrol Division; a detective in the Detective Bureau; a Corporal in the Training Unit; a sergeant in the Uniform Patrol Division; a sergeant in the Office of the Chief of Police in the capacity of Legal Officer; a lieutenant in the Office of the Chief of Police in the capacity of Adjutant and Legal Officer; as a captain in the capacity of the Administrative Bureau Commander and Legal Officer and as the Police Academy Director for the Cobb

County Department of Public Safety Training Center. I am currently a police Major serving in the capacity of Precinct Commander for the Cobb County Police Department. I have approximately seventy-five (75) officers, to include supervisors, patrol officers and detectives, under my command. During most of my career, I have had an active role in training, particularly regarding issues of criminal procedure and criminal law, use of force, and policy research and development.

6. Since 2001, I have taught numerous courses at the Cobb County Police Department on criminal procedure, to include Fourth Amendment issues in search and seizure, Fifth and Sixth Amendment issues related to police interviews, interrogation and right to counsel, legal aspects of use of force, pursuits and emergency vehicle operations and police policy and procedure. I have taught these topics to police recruits, veteran patrol officers, detectives, as well as supervisors and command staff.

7. My job duties as Legal Officer required me to review various disciplinary matters and investigations of police officer misconduct on behalf of the Chief of Police and to provide advice to the Chief on such matters. As the Police Academy Director, I reviewed vehicle pursuits and officers involved uses of force. As a precinct commander, my duties include reviewing the use of force, pursuits, and alleged misconduct by officers under my command for policy and law compliance and to identify training issues.

8. As a member of the Legal & Liability Risk Management Institute Board of Advisor's, I have researched and assisted in drafting policies for law enforcement

agencies relating to high-risk critical tasks including use of force, arrest, search & seizure, pursuit, emergency vehicle operation, special operations, internal affairs, hiring and selection-retention of officers, care-custody-control and restraint of prisoners, sexual harassment-discrimination and sexual misconduct, domestic violence, and dealing with the mentally ill.  I have also conducted training on the above topics to various law enforcement officers and school officials nationally.

9.  I also write articles related to law enforcement practice and law for the Legal and Liability Risk Management Institute.  Such articles can be found free of charge on the internet at llrmi.com (Legal Liability Risk Management Institute).

10. In 2009, I was a featured speaker at the South Carolina Municipal Association Conference on the topic of technology used for law enforcement.

11. Also, relevant to this case, I completed a Use of Force Instructor Training Program in 2012 at Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia.  Additionally, I regularly teach use of force considerations and law to police officers, and I have been certified as a Taser Instructor and user.

12. My experience, training and background are more fully described in the attached curriculum vitae, which I incorporate by reference to this report.

13. I have reviewed the following materials to date regarding this case:

a.  **Pleadings**
b.  4 - Defendants' Motion to Dismiss, Memo, & Exhibits (09-03-2020)
c.  17 - R&R (10-29-2020)
d.  20 - Pl's Objection to R&R (11-12-2020)
e.  22 - Defendants' Obj to R&R (11-12-2020)
f.  24 - Defs' Reply to Pl's Objections to R&R (11-30-2020)
g.  33 - Order on R&R
h.  47 - Second Amended Complaint (02-11-2021)

**Depositions**

i.   Kruger, Robert Deposition Transcript & Exhibits
j.   Loftly, Elizabeth Deposition Transcript
k.   Taylor, William Deposition Transcript
l.   Terrell, Sgt. Ryan K. Deposition Transcript
m.   *EMTS:*

**Defendants' Production**

n.   1283 Charleston Co EMS 0001-0004
o.   ACDC 0001-0081
p.   BCSO Subpoena 0001-0025
q.   CCSO 0001-0009-OCR
r.   Charleston County Solicitor's Office Subpoena 0001-0036-OCR
s.   North Charleston Municipal Court 0001-0034
t.   SLED 0001-0006
     *NChas only:*
u.   NCPD 0001-0008
v.   NCPD 0009-0020-UOF (03-08-2017)
w.   NCPD 0021-0028-Search & Seizure (03-08-2017)
x.   NCPD 0029-0032-Uniform Traffic Tix, Bench Warrants (09-28-2020)

**Plaintiff's Production**

y.   File Hx-looks like Solicitor's File or public defender file-OCR
z.   General Sessions- looks like Solicitor file
aa.  N Chas FOIA Response (attached to Subpoena for 30(b)(6) depo
bb.  Seabrook SLED Catch
cc.  Expert Report of Dr. Roy G. Taylor

*Body Cam-Supp rec'd 2.6*

dd.  2011710582_170705_000739
ee.  2011711009_170705_000738
ff.  2011711121_170705_000702

14. My opinions expressed in this report are based upon the materials provided and
    reviewed to this date. The opinions presented in this report are based upon my
    specialized experience, training and knowledge of police practices as well as my
    education and continued research and work with law enforcement nationally. This
    work includes conducting training for law enforcement around the United States.

My opinions are provided with a reasonable degree of certainty within the fields of law enforcement, police activity and police administration, supervision and command. I am familiar with police civil litigation and know the normal phases of discovery. With this in mind, I recognize that there may be additional documentation as the case progresses. If additional material is produced, I shall be prepared to supplement this report.

15. The facts relied upon to author this report are based upon the video recordings of the incident, as well as a combination of the materials reviewed above and, as much as possible, I specifically avoid drawing conclusions based upon credibility of the parties.

16. A summary of facts are as follows:

a. On or about July 4, 2017, at approximately 1900 hours, Sergeant Kruger, Officer Thomes, Officer Taylor, and Officer Greene were working a detail at a Fourth of July festival.

b. According to Sergeant Kruger's incident report, a white female approached and told him that her ex-boyfriend was at the festival, he had outstanding warrants from a domestic violence incident, and he was not supposed to be around her due to a protective order.[1] She also told Sergeant Kruger that he has been hiding from the police and will fight or run if contact is made.[2] She told Sergeant Kruger his name was Seabrook but did not provide his date of birth.[3] She pointed out the area in which she had seen Seabrook and where she was sitting at the festival,

---

[1] NCPD 0001-0008 (Incident Report, Case No. 201719925, Sgt. Kruger)
[2] Id.
[3] Sergeant Kruger Deposition, P. 42, L. 1-3

which was about 50-feet away from Seabrook.[4] Further, she told Sergeant Kruger

that she was "scared for her safety and her life"[5] and "really scared and nervous."[6]

c.  The same female approached Officer Greene and Officer Thomes and told them
there was a wanted person by the concert stage. She then pointed out a black male
with dreadlocks, wearing blue shorts and no shirt.[7]

d.  Sergeant Kruger wrote in his incident report that when he approached the male
later identified as David Seabrook, he smelled the odor of alcoholic beverage and
marijuana coming from his body.[8] Officer Greene reported that he smelled the
odor of alcoholic beverage coming from the male, and the male seemed
"intoxicated or disoriented."[9] Body camera video showed that officers spoke with
Seabrook approximately 30-40 seconds prior to attempting to handcuff him. An
officer is heard on video explaining that someone told them he had a warrant.[10]
The officer asked him for identification.[11] Seabrook held a phone to his ear and
did not provide identification or verbally identify himself.

e.  Seabrook was not cooperative and tried to walk away. He was blocked from
walking away by two officers, and he turned around and walked toward Sergeant
Kruger. Approximately 30-40 seconds into the encounter on video, Sergeant
Kruger removed his handcuffs and officers took Seabrook by the hands. At this
point, Seabrook appears to fall to the ground by his own accord onto his knees,

---

[4] Id. at L. 19-23
[5] Id. at P.40, L.22-23
[6] Id. at P.41, L. 1
[7] Incident Report, Case No. 201719925, Supplemental Report of Officer Greene
[8] Id.; see Supplemental Report of Sergeant Kruger
[9] Id.; see Supplemental Report of Officer Greene
[10] Body camera 2011711009_170705_000738.mp4 at :06 seconds

[11] Id. at approx.. :10 seconds

then face down.[12]  Seabrook admitted in his deposition that he intentionally fell down because he thought that was the safest place for him to be to protect himself.[13]

f.  At least four officers can be seen on body camera struggling to handcuff Seabrook. Seabrook can be seen on body camera reaching under his body with both arms and tensing his muscles.[14]  At one point, an officer is heard on body camera stating, "he's reaching for that black bag."[15]  Officer Green also wrote in his supplemental report that Seabrook had his arms under his body and appeared to be "attempting to retrieve something from a small black bag which he pulled under his abdomen."[16]

g.  The struggle to place Seabrook in handcuffs took approximately two-and-a-half minutes.   After Seabrook was handcuffed, a small black bag or fanny pack was visible on the ground near him.[17]  The officers did not strike, spray, or Tase Seabrook.

h.  EMS was immediately summoned via radio for Seabrook.[18]  Medical personnel are seen on video approximately three minutes later.[19]  Shortly thereafter, Seabrook is seen on video attempting to kick first-responders.[20]  Restraints were placed on Seabrook's feet to limit his ability to kick.

---

[12] Body camera 2011710582_170705_000739.mp4 at :40 sec.
[13] Seabrook Deposition, P. 84, L. 18-20; P. 89, L. 11-12
[14] 2011711121_170705_000702.mp4 at :40 sec; 2011710582_170705_000739.mp4 at :40 sec, :58 sec, 2:30; 2011711009_170705_000738.mp4 at :52 sec, 1:19.
[15] 2011711009_170705_000738.mp4 at 1:33
[16] NCPD 0001-0008 (Incident Report, Case No. 201719925, Officer Greene Supplemental Report
[17] 2011710582_170705_000739.mp4 at 6:37
[18] 2011711121_170705_000702.mp4 at approx. 3:00
[19] Id. at 6:00
[20] Id. at 7:30

i.  Seabrook refused and physically resisted being placed on a backboard so he was carried to the transport van. At the transport van, he is seen on video refusing to enter by using his feet to block entry into the van.[21]

j.  EMS personnel then sedated Seabrook and he was placed on stretcher and placed in an ambulance.[22]

k.  A search incident to arrest for Resisting and Disturbing the Peace led to the discovery of a marijuana cigarette in the small black bag (fanny pack). Seabrook was also charged with Simple Possession of Marijuana.

**Opinion: It is my opinion that Sergeant Kruger and the other officers (Taylor, Thomes, and Green) would be acting in accordance with generally accepted police practice in believing they had sufficient reasonable suspicion to initiate an investigative detention of David Seabrook.**

17. It is my opinion, based on my background, training, experience as a police officer, experience as a detective, experience as a police supervisor, experience as a police commander, experience as a police instructor, my education, and my continued research, writing, and training, that a reasonable officer and well-trained officer in the position of Sergeant Kruger and other officers on scene in the incident at hand would be acting in accordance with generally accepted police practice in believing they had sufficient reasonable suspicion to initiate an investigative detention of Seabrook. I base this opinion upon the following:

---

[21] 2011710582_170705_000739.mp4 at 12:00
[22] Id. at 14:45; Officer Green Supplemental Report

a.  According to Sergeant Kruger's incident report, a white female approached and told him that her ex-boyfriend was at the festival, he had outstanding warrants from a domestic violence incident, and he was not supposed to be around her due to a protective order.[23] She also told Sergeant Kruger that he has been hiding from the police and will fight or run if contact is made.[24] She told Sergeant Kruger his name was Seabrook but did not provide his date of birth.[25] She pointed out the area in which she had seen Seabrook and where she was sitting at the festival, which was about 50-feet away from Seabrook.[26] Further, she told Sergeant Kruger that she was "scared for her safety and her life"[27] and "really scared and nervous."[28]

b.  The same female approached Officer's Thomes and Green within ten minutes and told them there was a wanted person by the concert stage. She then pointed out a black male (later identified as Seabrook) with dreadlocks, wearing blue shorts and no shirt.[29]

c.  Sergeant Kruger wrote in his incident report that when he approached Seabrook, who had not yet been identified, he smelled the odor of alcoholic beverage and marijuana coming from his person.[30] Officer Greene reported that he smelled the odor of alcoholic beverage coming from the male, and the male seemed

---

[23] NCPD 0001-0008 (Incident Report, Case No. 201719925, Sgt. Kruger)
[24] Id.
[25] Sergeant Kruger Deposition, P. 42, L. 1-3
[26] Id. at L. 19-23
[27] Id. at P.40, L.22-23
[28] Id. at P.41, L. 1
[29] NCPD 0001-0008 (Incident Report, Case No. 201719925, Sgt. Kruger); see also Supplemental Report of Officer Greene
[30] Id.; see Supplemental Report of Sergeant Kruger

"intoxicated or disoriented."[31]  Officer Taylor testified in his deposition that, as

he was standing in front of Seabrook, he could detect the odor of marijuana and

alcohol.[32]

d. An officer is heard on video explaining that someone told them he had a warrant.[33]

The officer asked him for identification.[34]  Seabrook, in his deposition, admitted

that the officers asked him for identification and asked him for his name.[35]

e. All three of the body camera videos of the interaction show that Seabrook was not

cooperative.  He attempted to walk away from the officers.  He was blocked from

walking away by two officers, and he turned around and walked toward Sergeant

Kruger.  The encounter lasted approximately 30-40 seconds.  At this time,

Sergeant Kruger removed his handcuffs to detain Seabrook.

f. To comply with generally accepted police practice, officers are trained that, they

need, at a minimum, reasonable suspicion of criminal activity to detain a person

for a brief investigation of criminal activity.  In training, officers are taught that

"reasonable suspicion" is generally defined *as specific, articulable facts, based

on an officer's knowledge, training and experience, that would lead a reasonable

officer to believe that criminal activity is afoot.*[36] Additionally, officers are trained

that face-to-face tips, even where the informant's identity is unknown typically

do provide sufficient reasonable suspicion to justify an investigative detention.[37]

---

[31] Id.; see Supplemental Report of Officer Greene
[32] Officer Taylor Deposition, P. 18, L. 9-12
[33] Body camera 2011711009_170705_000738.mp4 at :06 seconds

[34] Id. at approx.:10 seconds
[35] David Seabrook Deposition, P. 103, L. 24
[36] Terry v. Ohio, 392 U.S. 1 (1968)
[37] *Henness v. Bagley,* 644 F.3d. 308, 318-319 (6th Cir. 2011); see also *U.S. v. Griffin,* 589 F. 3d. 148 (4th Cir. 2009)

This is because (1) on a face-to-face tip, the officer can assess the informant's demeanor, (2) the informant risks being held accountable if the tip is false, and (3) on a face-to-face tip, the time and space proximity to the incident related to the tip shows that the informant has firsthand information.[38]  Applying this to the facts of Seabrook's case, first, the female that approached Sergeant Kruger did so face-to-face and told him she was "scared for her safety and life" and "really scared and nervous" based on Seabrook's proximity to her.[39]  Second, the female pointed out the area she had seen Seabrook and pointed out the area in which she was sitting.[40] She also said that she was Seabrook's ex-girlfriend. As such, the possibility of being held accountable for providing false information was present, and this leans toward enhancing the credibility of the information.  It is noted that the officers did not locate her after the incident but Seabrook's conduct required officers to focus on him.  Further, even at the ambulance, officers had still not fully identified Seabrook to check for warrants.  Third, the time and space proximity to Seabrook enhanced the reliability of the tip.  In fact, the female even approached Officer's Green and Thomes and directly pointed Seabrook out to them.

Therefore, based on the facts discussed in Paragraph 17, Subparagraphs (a) through (e), particularly (1) a face-to-face tip, in public, regarding a wanted person, (2) who is hiding from police and will run or fight, (3) who is subsequently pointed out to officers by the tipster, and (4) who despite hearing the officer's

---

[38] Id.
[39] Sergeant Kruger Deposition, P.40,L.22-23; P.41, L.1
[40] Id. at P.42, L. 19-23

requests to identify himself, refuses to provide ID or state his name, (5) who smells of marijuana, and (6) attempts to walk away, it is my opinion that Sergeant Kruger and the other officers (Taylor, Thomes, and Green) acted in accordance with generally accepted police practice in believing they had sufficient reasonable suspicion to initiate an investigative detention of Seabrook to determine if he had an active warrant, marijuana and/or was in violation of a protective order.

**Opinion: It is my opinion that Sergeant Kruger and other officers (Taylor, Thomes and Green) acted in accordance with generally accepted police practice when they decided to handcuff Seabrook during the investigative detention. Additionally, the force used to handcuff Seabrook was in accordance with generally accepted police practice.**

18. It is my opinion, based on my background, training, experience as a police officer, experience as a detective, experience as a police supervisor, experience as a police commander, experience as an instructor, education, and continued research, writing, and training, that Sergeant Kruger and the other officers (Taylor, Thomes, and Green) acted in accordance with generally accepted police practice when they decided to handcuff Seabrook during the investigative detention.

a.  This is based on the following:

1. All facts contained in Paragraph 17, Subparagraphs (a) through (e) are incorporated by reference.

2.  As the officers spoke to Seabrook and asked him for his ID and his name, Seabrook attempted to walk off, but his path was blocked by officers. Further, Seabrook refused to acknowledge the officers and remained on the phone, despite

13

the fact that he admitted in his deposition that he understood the officers requested his ID, but he did not think he was required to provide that or his name to officers.[41]

3. The officers were told by the female that provided the tip that Seabrook had been hiding from the police and would run or fight.

4. Seabrook is six foot, four inches (6'4") tall and approximately 215 lbs.

5. Officers are trained that (1) investigative detentions must be justified at their inception and (2) the officer's actions must be reasonably related in scope to the circumstances which justified the detention.[42] For an investigative detention to be justified at its inception, it must be supported by reasonable suspicion. An officer's actions are reasonable in scope when one considers the circumstances that justified the initial stop balanced against the methods used by the police.

Therefore, based on the facts discussed Paragraph 18, Subparagraph (a)(1-5), particularly (1) a face-to-face tip regarding a wanted person, (2) who is hiding from police and will run or fight, (3) who is 6'4" tall and 215 lbs, (4) who is subsequently pointed out to officers by the tipster, and (5) who despite hearing the officer's requests to identify himself, refuses to provide ID or state his name, and (6) who attempted to walk away from the officers, it is my opinion that Sergeant Kruger and the other officers (Taylor, Thomes, and Green) acted in accordance with generally accepted police practice in deciding to handcuff Seabrook during the investigative detention in order to check if Seabrook was wanted or in violation of a protective order, because Seabrook was reported to possibly run or fight, he demonstrated an unwillingness to

---

[41] Seabrook Deposition, P. 223, L.9-19
[42] *Ellsworth v. City of Broken Arrow, No. 20-5032, p. 6-7 (10th Cir. Decided March 18, 2021 Unpublished)*

cooperate which, as officers are trained, often precedes running or fighting, and Seabrook attempted to walk away. As such, handcuffing Seabrook was directly related the initial justification of the stop (identifying Seabrook to check for warrants and/or a protective order).

b. Additionally, it is my opinion, based on my background, training, experience as a police officer, experience as a detective, experience as a police supervisor, experience as a police commander, experience as an instructor, education, and continued research, writing, and training, that the force used by Sergeant Kruger and the other officers (Taylor, Thomes, and Green) to handcuff Seabrook was in accordance with generally accepted police practice. This is based on the following:

1. Seabrook is seen, on body cameras, actively using his muscular strength to resist being handcuffed. This conduct constitutes active resistance under generally accepted police practice.[43]

2. According to the North Charleston Police Department Use of Force Policy, Section IV, A., (1) states the following:

> (c) Level 3: Passive Physical Resistance – slight potential for physical harm: A subject physically refuses to comply or respond to an officer's command. The subject does not make any attempt to physically harm the officer, but forces the officer to engage in physical maneuvers to take a person into custody. Examples of

---

[43] IACP, Model CEW Policy defines Active Resistance as "*the use of non-assaultive physical measures by an unarmed person, including flight, to resist and or prevent an officer from gaining control.*"

*passive physical resistance may include bracing, tensing, or any*

*other act that offers no active physical resistance.*

*(d) Level 4: Active Physical Resistance – moderate potential for*

*physical harm: A subject physically makes aggressive maneuvers*

*that actively and physically resist the officer's attempt at arrest or*

*seizure. This may be in the form of pushing and or pulling away*

*from the officer while attempting to seize or place a suspect under*

*lawful arrest.*

On a body camera recording, during the attempted handcuffing, Seabrook can be seen tensing his right arm and then attempting to push up away from the officers as if to stand.[44]  Additionally, Sergeant Kruger wrote in his report that Seabrook "*placed his head on Officer Thomes chest and pushed into the ground while kicking his feet into the air.*"[45]  In fact, due to Seabrook's active resistance, it took approximately two minutes and thirty seconds (2:30) to handcuff Seabrook.  Seabrook's resistance appears to meet the definition of Level 4 resistance in that he "*physically resisted the officer's attempt at arrest or seizure. This may be in the form of pushing or pulling away from the officer…*" At a minimum, Seabrook's conduct clearly met the definition of Level 3 resistance by "*bracing*" and "*tensing*" to resist being handcuffed.  According to the Use of Force Policy, Section IV, Subsection A., (2)(c), Level 3 Resistance allows for the use of the following:

---

[44] Body camera 2011710582_170705_000739.mp4 at :58 seconds; 2:40

[45] NCPD 0001-0008 (Incident Report, Case No. 201719925, Sgt. Kruger)

Level 3: Physical Control – slight potential for physical harm:

> *(1) Restraint devices: Mechanical tools used to restrict a subject's movement and facilitate searching; such as handcuffs, flex cuffs, leg irons, belly chains, etc.*

> *(2) Escorts: Techniques used to control and/or move a subject from point A to point B with minimum effort by the officer in order to gain and retain control over the subject.*

> *(3) Take Downs: Techniques that redirect, in a controlled manner, a subject to the ground in order to limit physical resistance and to facilitate the application of a restraint device.*

> *(4) Pain Compliance: Techniques that force a subject to comply with an officer as a result of the officer inflicting controlled pain upon specific points in the subject's body, such as pressure point techniques.*

> *(5) Counter Moves: Techniques that impede a subject's movement, such as blocking, dodging, weaving, re-directing, or avoiding, followed by appropriate controlling techniques.*

Under Level 4 resistance, the use of defensive weapons, such as Tasers, OC spray and batons, are allowed.

In Seabrook's case, the officers only attempted to handcuff Seabrook. They did not use OC spray, strikes, or Tasers. There is an approximately eight (8) second period where a hand can be seen on Seabrook's chin and jaw area.[46] This

---

[46] 2011710582_170705_000739.mp4 at 2:22, 25, 28-30

occurred at time when Seabrook can be seen actively resisting officers, using his muscular strength to try to stand up as officers attempted to handcuff him. This did not appear to be a chokehold, as the hand was not in a position to perform a chokehold.   The officers grabbed for Seabrook's hands even as he appeared on body camera to be reaching under his body, possibly for a black bag, which at the time it was unknown if that bag contained a weapon.[47]

3. In my opinion, the body camera footage of the officers as they attempted to handcuff Seabrook revealed no conduct related to the use of force that appeared to violate generally accepted police practice.

Therefore, it is my opinion that that the force used by Sergeant Kruger and the other officers (Taylor, Thomes, and Green) to handcuff Seabrook was in accordance with generally accepted police practice.

**Opinion:  It is my opinion that Sergeant Kruger and other officers (Taylor, Thomes, and Green) acted in accordance in with generally accepted police practice in believing that probable cause was present to arrest Seabrook for Disturbing the Peace, Resisting and Possession of Marijuana.**

19. It is my opinion, based on my background, training, experience as a police officer, experience as a detective, experience as a police supervisor, experience as a police commander, experience as an instructor, education, and continued research, writing, and training, that Sergeant Kruger and other officers (Taylor, Thomes, and Green) acted in accordance with generally accepted police practice in

---

[47] Body Camera, 2011711009_170705_000738, at :52-1:33

believing that probable cause was present to arrest Seabrook with Disturbing the

Peace, Resisting and Possession of Marijuana. This is based on the following:

a.  Law enforcement officers are trained that probable cause is required to make and

arrest or obtain an arrest warrant.  They are further trained that "*Probable cause exists*

*where "the facts and circumstances within their [the officers'] knowledge and of*

*which they had reasonably trustworthy information [are] sufficient in themselves to*

*warrant a man of reasonable caution in the belief that" an offense has been or is*

*being committed.*"[48]

b.  Seabrook was charged with Breach of the Peace under the Common Law of South

Carolina.  Under this law, "*the term "breach of the peace"*

*...is a generic one embracing a great variety of conduct destroying or menacing*

*public order and tranquility. In general terms a breach of peace is a violation of*

*public order, a disturbance of the public tranquility, by any act or conduct inciting*

*to violence, which includes any violation of any law enacted to preserve peace*

*and good order.*"[49] In Seabrook's case, he was suspected of having an active

warrant, he smelled of alcohol and marijuana, he attempted to walk away from

officers when they were investigating a report that he had an active warrant, he

intentionally fell onto the ground when Sergeant Kruger attempted to handcuff

him, he tensed his arms to avoid handcuffing, he reached for a small black "fanny

pack" bag under his body as officers attempted to handcuff him, and he pushed

officers and attempted to stand up, while yelling and drawing a crowd by his

---

[48] *Brinegar v. United States*, 338 U.S. 160, 179 (1949)(citing *Carroll v. United States*, 267 U.S. 132, 162 (1925))
[49] Opinion of the Attorney General of South Carolina, September 23, 2003 (quoting State v. Poinsett, 250 S.C. 293, 297, 157 S.E.2d 570, 571 (1967))

actions. This occurred during an officer/citizen contact that was conducted in accordance with generally accepted police practice.[50] In light of Seabrook's actions, it is my opinion that a reasonable and well-trained officer in Sergeant Kruger's position would act in accordance with generally accepted police practice in believing probable cause was present to arrest Seabrook for Breach of the Peace, in that Seabrook's conduct as the officers attempted to investigate if he had an active warrant disturbed the public tranquility or peace.

c.  Seabrook was charged with Resisting Arrest under South Carolina Code of Laws, Section 16-9-320. Under this law, it is unlawful for a person to "*knowingly and willfully to oppose or resist a law enforcement officer in serving, executing, or attempting to serve or execute a legal writ or process **or to resist an arrest being made by one whom the person knows or reasonably should know is a law enforcement officer, whether under process or not.***"[51] Here, (1) Seabrook was suspected of having an active warrant and/or protective order, (2) he attempted to walk away from officers when they were investigating a report that he had an active warrant, (3) he intentionally fell to the ground when Sergeant Kruger attempted to handcuff him to facilitate the investigative detention, (4) he tensed his arms to avoid handcuffing, (5) he reached for a small black "fanny pack" bag under his body as officers attempted to handcuff him, (6) he pushed officers and attempted to stand up, (7) while yelling and drawing a crowd by his actions. It took officers approximately two minutes and thirty seconds (2:30) to handcuff Seabrook. Seabrook also knew that Sergeant Kruger and the other officers were

---

[50] See Expert Report of Brian Batterton, Paragraph 17
[51] South Carolina Code of Laws, Section 16-9-320(A) (emphasis added)

in fact police officers and he admitted in his deposition that he resisted their attempt to detain him and handcuff him because he did not think that they could require him to provide his ID or his name.[52] Viewed objectively, at the time of Seabrook's resistance, the encounter developed into a situation where the officers were acting within generally accepted police practice in arresting Seabrook for Breach of the Peace.[53] In light of Seabrook's actions, it is my opinion that a reasonable and well-trained officer in Sergeant Kruger's position would act in accordance with generally accepted police practice in probable cause was present to arrest Seabrook for Resisting Arrest in that, viewed objectively, Seabrook knowingly and willfully opposed and resisted the officers attempt to arrest him for Breach of the Peace.

d. Seabrook was charged with Possession of Marijuana under South Carolina Code of Laws, Section 44-53-370. Officers are trained that, when they make a lawful arrest, they may search the arrestee and the arrestee's belongings incident to arrest.[54] Here, Seabrook was arrested for Breach of the Peace (Common Law) and Resisting Arrest. Toward the beginning of this incident, when Sergeant Kruger initiated handcuffing, Seabrook intentionally fell onto the ground in close proximity to a black "fanny pack" bag. During the struggle to handcuff Seabrook, Sergeant Kruger reported that Seabrook kept his hands under his body near the black fanny pack. Additionally, on body camera, an officer can be heard stating, "He's reaching for that bag."[55] After Seabrook was handcuffed, the "fanny pack" bag was searched incident

---

[52] Seabrook Deposition, P. 223, L.9-19
[53] See Expert Report of Brian Batterton, Paragraph 19(a)
[54] U.S. v. Edwards, 415 U.S. 800 (1974); U.S. v. Robinson, 414 U.S. 218 (1973)
[55] Body Camera, 2011711009_170705_000738, at 1:33

to arrest and a suspected marijuana cigarette was located. Therefore, it is my opinion that a reasonable and well-trained officer in Sergeant Kruger's position would act in accordance with generally accepted police practice in believing probable cause was present to arrest Seabrook for Possession of Marijuana under South Carolina law.

**Opinion: It is my opinion that a reasonable and well-trained officer would be acting in accordance in with generally accepted police practice in deciding to move Seabrook to the transport van.**

20. It is my opinion, based on my background, training, experience as a police officer, experience as a detective, experience as a police supervisor, experience as a police commander, experience as an instructor, education, and continued research, writing, and training, that Sergeant Kruger, other officers (Taylor, Thomes, and Green) and other unnamed officers acted in accordance with generally accepted police practice in deciding to move Seabrook to the transport van. This is based on the following reasons:

a. Seabrook was yelling and drawing a crowd at his location near the concert stage. This was a continued breach of the peace, and the large crowd could pose a danger to officers and medical personnel at the scene. It is consistent with generally accepted police practice to move arrestees to a location where they are away from crowds and where is there is better security and ability to provide for safe transport whether to a detention facility or to a hospital for medical treatment.

b. On body camera, Seabrook is seen kicking at first-responders.[56] Officers then put restraints on Seabrook's feet.

---

[56] Body Camera, 2011711121_170705_000702, at 7:30; Body Camera, 2011710582_170705_000739, at 7:39

22

c. On body camera, Seabrook is seen refusing to be placed on a stretcher to be carried away from the crowded stage area. He is then physically carried to the transport van.[57]

d. At the transport van, Seabrook wedged his feet in the door to prevent being placed inside, kicked at officers, and attempted to bite a medic.[58] In his deposition, Seabrook admitted that he resisted being placed in the transport van. Seabrook admitted in his deposition that he "snapped" his mouth a medic but did not attempt to bite her.[59]

e. Medics then sedated Seabrook to overcome his violent resistance.

Based upon the facts listed in Paragraph 20, Subsections (a) through (e), it is my opinion that Sergeant Kruger, other officers (Taylor, Thomes, and Green), and any unnamed officer involved acted in accordance with generally accepted police practice in deciding to move Seabrook to the transport van, away from the crowd to a safer, less populated area.

**Opinion: It is my opinion that the applicable policies of the North Charleston Policy Department are in accordance with generally accepted police practice.**

21. It is my opinion, based on my background, training, experience as a police officer, experience as a detective, experience as a police supervisor, experience as a police commander, experience as an instructor, education, and continued research, writing, and training, that the Use of Force Policy and Search and

---

[57] Body Camera, 2011710582_170705_000739, at 11:45; Body Camera, 2011711121_170705_000702, at 11:42

[58] Officer Green, Supplemental Report

[59] Seabrook Deposition, P. 127, L. 1-3

Seizure Policy of the North Charleston Police Department (NCPD) are in accordance with generally accepted police practice. I base this opinion on the following:

a. The NCPD Use of Force Policy and the Search and Seizure Policy comply with current legal mandates.

b. The NCPD Use of Force Policy is in accord with or is more restrictive than other use of force policies that constitute generally accepted police practice.

c. I saw no evidence in any of the materials reviewed that indicated that the NCPD or the City acted inconsistent with generally accepted police practice regarding a policy, custom or practice of excessive force or unlawful search and seizure, of which the final policy maker would have been aware, and subsequently failed to take corrective action and/or provide training to correct such excessive force.

As such, it is my opinion that the NCPD Use of Force Policy and Search and Seizure Policy are in accordance with generally accepted police practice.

22. I have also reviewed the report of plaintiff's expert, Dr. Roy G. Taylor and it does not alter my opinions in this case. I will be prepared to discuss this, if required.

23. At this stage of my review I do not know if I may be asked to review additional documents. Should I be asked to review any additional documents, I will be prepared to render additional opinions or supplement the opinions stated within this report.

24. At this point in the development of this case I do not know whether I will be using any demonstrative aids during my testimony. Should I decide to use any such

tool; I will assure that they are made available for review, if requested, prior to their use.

25. My fees for this professional service are an initial retainer fee of $5,000 paid to LLRMI, and any work over 20 hours will be billed at $250/hour. Additionally, there is a fee of $2500 for a deposition in Marietta, Georgia or $2500 per day plus expenses for services away from Marietta, Georgia including depositions and trial appearances.

This report is signed on this ⅃3 day of ____September____, 2021, in Marietta, Georgia.

Brian S. Batterton